**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

PHL Variable Insurance Company,

                  Plaintiff,        Civ. No. 10-1197 (RHK/AJB)
                                         **MEMORANDUM OPINION
                                         AND ORDER**

v.

U.S. Bank National Association, *et al.*,

                  Defendants.

---

Thomas F.A. Hetherington, Jarrett E. Ganer, Allison M. Abel, Edison, McDowell & Hetherington, LLP, Houston, Texas, Terence M. Fruth, Adam A. Gillette, Fruth, Jamison & Elsass, PLLC, Minneapolis, Minnesota, for Plaintiff.

Thomas F. Nelson, Steven P. Zabel, Aleava Rael Sayre, Leonard, Street, and Deinard, PA, Minneapolis, Minnesota, Peter A. Bicks, Philipp Smaylovsky, Orrick, Herrington & Sutcliffe, LLP, New York, New York, for Defendant U.S. Bank National Association.

---

**INTRODUCTION**

This action arises out of a $5,000,000 life insurance policy (the "Policy") issued by Plaintiff PHL Variable Insurance Company ("PHL") and insuring the life of Martha Higuera. The original Policy owner/beneficiary was the 2008 Martha Higuera Irrevocable Trust (the "Trust"), but the Trust's rights were later assigned to Defendant U.S. Bank National Association ("USB"). Alleging that it was induced to issue the Policy by fraud, PHL commenced this declaratory-judgment action against the Trust, its trustee, and USB, seeking *inter alia* the Policy's rescission. USB now moves to dismiss

Count II of the Complaint, which seeks rescission due to material misrepresentation. For the reasons that follow, its Motion will be granted.

## BACKGROUND

This case involves an alleged "STOLI" transaction. The Court in <u>Lincoln National Life Insurance Co. v. Calhoun</u>, 596 F. Supp. 2d 882 (D.N.J. 2009), summarized such a transaction:

> [A] growing cottage industry in the insurance market [is] known as stranger-owned life insurance policies or "STOLI" plans, in which an individual, typically an elderly one, procures life insurance on his own life in order to subsequently assign the policy to a third party following the lapse of the two-year contestability period.[1] STOLI transactions are the product of the burgeoning "life settlements" market, in which insureds sell unneeded or unaffordable permanent policies to investors. STOLI schemes emerged as investor demand for these policies exceeded supply, leading industry speculators to solicit insureds to take out additional policies, even if the insureds had no particular need for supplemental insurance coverage. Often, the insureds are persuaded to engage in these STOLI transactions because their bank accounts have run dry and they are forced to spend increasing amounts of money on medical care. As one court put it, "[o]ften pejoratively termed 'stranger-owned life insurance policies' these policies enable the insured to obtain ready cash by selling his policy to a stranger whose only interest in the insured is his early demise." <u>Life Prod. Clearing LLC v. Angel</u>, 530 F. Supp. 2d 646, 648 (S.D.N.Y. 2008).
>
> A typical STOLI transaction is structured as follows. An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate up-front cash in exchange for promising a future sale of the policy. The agent informs the candidate that the candidate will be able to obtain the policy at virtually no cost to himself, because the agent has secured non-recourse financing to purchase the policy. The candidate then acts as a "nominal grantor" of a life insurance trust that is used to apply for the policy. "At that time, the agent will tell the insured that, in all

---

[1] Many states, including Minnesota, have statutes that preclude challenges to life insurance policies more than two years after the policy issued. <u>See</u> Minn. Stat. § 61A.03, subd. 1(c) (requiring every life insurance policy issued in Minnesota to contain a clause providing that it is "incontestable after it has been in force . . . for two years from its [issue] date").

probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured. . . . If the insured survives [the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options, in addition to the sale of the policies to investors: (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure." The insureds are usually able to garner significantly greater sums from the speculators than they would receive by surrendering the policy to the insurance company. See Liam Pleven & Rachel Emma Silverman, Cashing In An Insurance Man Builds A Lively Business In Death-As Life Settlements Boom, Banks, Regulators Circle, Wall St. J., Nov. 27, 2007, at A1.

As the New York Times reported several years ago, "[t]rading in life insurance policies held by wealthy seniors has quietly become a big business. Hedge funds, financial institutions . . . , and investors . . . are spending billions to buy life insurance policies from the elderly. Other investors are paying seniors to apply for life insurance, lending the money to buy the policies, and then reselling them to speculators." Charles Duhigg, Late in Life, Finding a Bonanza in Life Insurance, N.Y. Times, December 17, 2006, at 1. The secondary market has grown from $200 million in transferred death benefits in 1998 to $12 billion less than a decade later in 2005. One study suggested that as many as 89% of life insurance policies did not pay out death benefits.

Though both sides to this controversy agree that consumers should be permitted to sell unnecessary policies on a secondary market, some have suggested that the increasing popularity of STOLI transactions, as well as the controversy engendered by them, frustrates the legitimacy of the secondary life settlements market. Life insurance was typically understood as a means of providing for dependents after the insured has passed on. As some insurance industry advocates have stated, "life insurance is a way for individuals to protect their families . . . If someone profits from a stranger's death, it stands the whole purpose of life insurance on its head." The insurance industry has further argued that such transactions will inevitably raise the cost of life insurance because insurance companies "count on many customers canceling their policies before they die, usually because their children grow up and no longer need the financial protection, their pensions kick in or premiums become too expensive."

Id. at 884-86 (internal citations omitted).

The above description of a STOLI transaction closely matches PHL's allegations in this case. It alleges that Higuera was approached by a stranger in a store and told that she could obtain free life insurance and $5,000 for applying for a policy. (Compl. ¶ 16.) Higuera agreed and later signed several documents, including a document establishing the Trust. The Trust (through Higuera) then applied for the Policy, naming itself as the beneficiary and Higuera as the insured. (Id.) PHL issued the Policy, which was later transferred by the Trust to USB. (Id. ¶¶ 21-22.)

According to PHL, Higuera and the Trust made several misrepresentations when procuring the Policy, including that (1) there was no agreement for the Policy to be sold to a third party, (2) Higuera received no financial inducements before submitting the application, and (3) Higuera had a net worth of $9.1 million. (Id. ¶ 18.) PHL alleges that had such misrepresentations not been made, it would not have issued the Policy. (Id. ¶ 23.)

In light of the foregoing, PHL commenced the instant action seeking a declaration that it may rescind the Policy due to lack of an insurable interest (Count I) and misrepresentation (Count II). It also seeks damages from the Trust on account of its alleged fraud (Count III) and negligent misrepresentation (Count IV). USB now moves to dismiss Count II, arguing that under Minnesota law, PHL can no longer challenge the Policy based on alleged misrepresentations.

**STANDARD OF DECISION**

I.      **Dismissal or summary judgment?**

USB has submitted with its Motion an Affidavit attaching (1) the Policy, (2) a letter from PHL to the Trust regarding the Policy's transfer to USB, and (3) a letter concerning when service of process was effected. (See Doc. No. 18.) Similarly, PHL has submitted two Affidavits (Doc. Nos. 28, 29) describing the difficulty it had securing local counsel and detailing the steps it took to file the Complaint. When "matters outside the pleadings are presented to and not excluded by the court" on a motion to dismiss, the motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56[.]" Fed. R. Civ. P. 12(b)(6).[2]

Here, much of the material submitted by the parties is beyond the pleadings. Insofar as that material bears directly on the controlling legal issue, as discussed in more detail below, and because both parties have had the opportunity to submit – and did submit – evidence regarding that issue, the Court will consider the material and treat the instant Motion as a motion for summary judgment on Count II.

II.     **Standard for summary judgment**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett,

---

[2] Certain types of extraneous materials, such as items "necessarily embraced by" the pleadings or matters mentioned or incorporated by reference therein, are not considered "outside the pleadings" under Rule 12(b)(6). See Fed. R. Civ. P. 10(c); Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003); Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).

477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

Count II of the Complaint, as noted above, seeks rescission of the Policy based on alleged misrepresentations made by Higuera (and the Trust) in procuring it. USB argues that this claim fails because it is untimely. The Court agrees.

USB's argument hinges on Minnesota Statutes Section 61A.03, subdivision 1(c), which requires every life insurance policy issued in Minnesota to provide that it is "incontestable after it has been in force . . . for two years from its [issue] date." The statute is similar to a statute of limitations and "limit[s] the time within which [a] policy may be contested for fraudulent answers in its procurement." Sellwood v. Equitable Life Ins. Co. of Iowa, 42 N.W.2d 346, 351 (Minn. 1950). The Policy here contains the statutorily mandated language (in slightly modified form, as discussed below).

There is no dispute that the Policy issued on April 7, 2008, and hence there is also no dispute that Minnesota's two-year contestability period expired on April 7, 2010. (See Def. Mem. at 5; Pl. Mem. at 7.) PHL argues that it contested the Policy within this period by commencing this action, but the problem with its argument is that it did not file its Complaint until April 8, 2010. (See Doc. No. 1.) Hence, it was one day too late, and the Policy has become incontestable under Section 61A.03. Count II, therefore, must be dismissed.[3]

PHL raises three arguments to avoid this result, but none is persuasive.

Date of filing. PHL argues that its Complaint should be deemed filed on April 7, 2010, when it was transmitted electronically to the Clerk's office. (See Pl. Mem. at 9-10.) But as PHL acknowledges, it did not email the Complaint until 5:33 p.m. on April 7, and this Court's Electronic Case Filing Procedures require new actions to be "filed between 8:00 a.m. and 5:00 p.m. Central Time." (Id. at 9 (citing D. Minn. Electronic Case Filing Procedures Guide § II(A)(2)(d)).) Those Procedures have been adopted by the Local Rules of this Court, see D. Minn. LR 5.1, and are expressly authorized by the

---

[3] The same logic would seem to bar Count I, in which PHL seeks rescission of the Policy for lack of an insurable interest. There is a split of authority on that issue, however. See Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust, Civ. No. 09-506, 2010 WL 2898315, at *4-6 (D. Del. July 20, 2010) (noting that some states bar all challenges to life insurance policies after expiration of the contestability period, while others have "allowed the insurer to contest the validity of a policy that is void [due to lack of an insurable interest], even after the passage of the contestability period"). The Minnesota Supreme Court has not yet opined on the question, although at least one judge of this Court has determined that a life insurance policy may be challenged for lack of an insurable interest beyond the contestability period. See Sun Life Assurance Co. of Can. v. Paulson, Civ. No. 07-3877, 2008 WL 451054, at *2 (D. Minn. Feb. 15, 2008) (Doty, J.). Because USB has not moved to dismiss Count I, the Court need not weigh in on this issue.

Federal Rules of Civil Procedure, see Fed. R. Civ. P. 5(d)(3). As a result of its after-hours submission, the Complaint was not filed until the following day, April 8.[4]

PHL asks the Court to overlook its delay because it had difficulty securing local counsel, but that contention is unpersuasive. The two-year contestability period had nearly expired before PHL took any steps to challenge the Policy. (See Pl. Mem. at 6.) Had PHL simply commenced its investigation even a few days earlier, its alleged difficulty securing local counsel would have been a non-issue. The Court will not excuse PHL's dilatoriness in filing the Complaint when it slept on its rights. See Pecoraro v. Diocese of Rapid City, 435 F.3d 870, 875 (8th Cir. 2006) (equitable tolling "should be applied *where a party acts diligently*, only to find himself caught up in an arcane procedural snare") (emphasis added) (internal quotation marks and citation omitted).[5]

Relying upon Lyons v. Goodson, 787 F.2d 411 (8th Cir. 1986) (*per curiam*), PHL argues that its "technically deficient" submission on April 7 was adequate. In Lyons, the district court had dismissed the case because the plaintiff had failed to file the correct number of copies of the complaint under the district court's local rules. The Eighth Circuit reversed, concluding that "local rule[s] should not be elevate[d] to the status of a jurisdictional requirement," and accordingly, "a complaint is filed when it is lodged with the court even though it is technically deficient under local rules." Id. at 412. PHL seizes

---

[4] Insofar as the Court concludes that the Complaint was not filed until April 8, it need not address USB's alternative argument that the action was not commenced until it was *served* on USB (on April 23), pursuant to the Minnesota Rules of Civil Procedure.

[5] For this same reason, the Court rejects PHL's argument that it would be "inequitable" to dismiss Count II. (See Pl. Mem. at 13-16.)

upon this language to argue that the Court should deem its 33-minute-late Complaint as filed on April 7, the date it was "lodged" with the Court.

Yet, the local rule at issue here is of a distinctly different character than the one involved in Lyons, as noted in a subsequent Eighth Circuit case on all-fours with the matter *sub judice*. In Stark v. Right Management Consultants, 247 Fed. Appx. 855 (8th Cir. 2007) (*per curiam*), the plaintiff had transmitted his complaint to the clerk of this Court at 11:27 p.m. on the last day of the limitations period. The Court (Frank, J.) dismissed the complaint as untimely, based upon Local Rule 5.1 and the Court's Electronic Case Filing procedures. The plaintiff appealed, raising the same arguments PHL makes here under Lyons. The Eighth Circuit affirmed:

> Unlike the deficiencies of form in [Lyons], the deficiency of [the] complaint was the timeliness of its filing. We are aware of no case in this circuit that holds that timeliness is a "matter of form" contemplated by the Federal Rules of Civil Procedure or a "technical[ ] deficien[cy]" under Lyons. As such, we are unwilling to hold that the district court abused its discretion by applying its local rules to hold that . . . [the] complaint was untimely because [the plaintiff] did not file it before 5:00 p.m., as required by Local Rule 5.1, on May 23.

Id. at 856. This analysis applies equally to the case at bar.[6]

"Contesting" the policy. PHL next argues that even if the Complaint were deemed filed on April 8 rather than April 7, it nevertheless "contested" the Policy in a timely fashion by lodging the Complaint with the Court on the earlier date. (See Pl. Mem. at 10-

---

[6] Neither party has referenced Stark, possibly because it is an unpublished opinion. But see Fed. R. App. P. 32.1 (unpublished opinions issued on or after January 1, 2007 may be cited); 8th Cir. R. 32.1A (same). When the Court mentioned it at oral argument, PHL acknowledged that the case undermined its argument, but nevertheless suggested that the Court should exercise its discretion to deny the Motion. The Court perceives no reason to do so.

11.) But PHL has cited no case law to support such a broad interpretation of the term "contest," and the Court rejects it.

Under PHL's logic, something less than a properly commenced lawsuit would be sufficient to contest an insurance policy. Carried to its logical conclusion, this would permit an insurer to contest a policy in any number of informal ways, such as sending a letter to the insured disputing the validity of the policy or even placing a telephone call to the insured. Indeed, PHL asked the Court to endorse such a result at oral argument, asserting that a letter to the insured is an appropriate way to contest an insurance policy in some states. Yet, it has long been recognized that an insurance policy may be contested "*in no other method* than by a judicial contest to which the insurer and the insured, or their representatives or beneficiaries, are parties." 17 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 240:89 (3d ed. 2010) (emphasis added) (collecting cases); accord, e.g., N.Y. Life Ins. Co. v. Hurt, 35 F.2d 92, 95 (8th Cir. 1929) ("[T]he great number and weight of authority favors the rule that [a] 'contest' must be by or in judicial proceedings. That is the expression in the latest opinion in this court [and] we think it accords with reason.").

In this Court's view, to effectively "contest" a policy under Section 61A.03, an insurer must *properly* commence an action challenging its validity. The leading treatise on insurance law endorses that interpretation. 17 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 240:89 (3d ed. 2010) ("[I]f the insurer desires to contest the policy, it must take appropriate steps to that end, . . . by *proper* affirmative action in a court of

equity to avoid the policy.").[7] Moreover, that interpretation is consistent with the principle that statutes of limitations – to which Section 61A.03 is analogous – must be "construed strictly against the plaintiff." Shipp v. Miller's Heirs, 15 U.S. (2 Wheat.) 316, 324 (1817); accord, e.g., Kersten v. Minn. Mut. Life Ins. Co., 608 N.W.2d 869, 873 (Minn. 2000). It is also consistent with the purpose behind Section 61A.03: to protect an insured (and designated beneficiaries) from a dilatory challenge to the insurance policy while also encouraging the insurer "to be diligent in performing its duty to investigate within a specified period, and to penalize it if it does not." Thal v. Berkshire Life Ins. Co., No. 3:98CV11, 1999 WL 200697, at *2 (D. Conn. Mar. 24, 1999).

For these reasons, the Court concludes that PHL failed to "contest" the Policy on April 7, 2010, by lodging the Complaint with the Clerk of the Court.

The Policy's fraud exception. Finally, PHL argues that it is not bound by the two-year limitation in Section 61A.03 because the Policy's incontestability clause expressly carved out claims for fraud. (See Policy § 21 (providing that Policy is "incontestable after it has been in force during the Insured's lifetime for two years from the Issue Date, *except for fraud*") (emphasis added).) The Court finds that this fraud exception in the Policy is void under Section 61A.03.

---

[7] The Minnesota Supreme Court had referred to Couch on Insurance as a "leading authority" on the interpretation of insurance statutes, Republic Ins. Co. v. Comm'r of Taxation, 138 N.W.2d 776, 779 (Minn. 1965), and Minnesota cases routinely cite it when interpreting insurance policies and Minnesota statutes governing the same. See, e.g., Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d 572, 575 (Minn. 2009); Schermer v. State Farm Fire & Cas. Co., 721 N.W.2d 307, 314 (Minn. 2006); RAM Mut. Ins. Co. v. Meyer, 768 N.W.2d 399, 404 & n.1 (Minn. Ct. App. 2009).

It is well settled in Minnesota (and elsewhere) that "contract provisions which conflict with statutory law [can] not be enforced." Roering v. Grinnell Mut. Reinsurance Co., 444 N.W.2d 829, 833 (Minn. 1989); accord, e.g., Hertz Corp. v. State Farm Mut. Ins. Co., 573 N.W.2d 686, 690 (Minn. 1998); AMCO Ins. Co. v. Lang, 420 N.W.2d 895, 900 (Minn. 1988). In the context of insurance, "an insurer's liability is governed by the contract between the parties *only as long as coverage required by law is not omitted and policy provisions do not contravene applicable statutes*." Hertz, 573 N.W.2d at 690 (emphasis in original) (quoting Streich v. Am. Family Mut. Ins. Co., 358 N.W.2d 396, 399 (Minn. 1984)). Here, the fraud exception in the Policy's incontestability clause flatly contravenes Section 61A.03. If the statute's text – providing that a policy is "incontestable after it has been in force . . . for two years from its [issue] date" – does not make that clear, then surely its *interpretation* removes any doubt. See Sellwood, 42 N.W.2d at 351 (statute "limit[s] the time within which [a] policy may be contested *for fraudulent answers in its procurement*") (emphasis added).[8] Accordingly, the Court concludes that the fraud exception in the Policy conflicts with Section 61A.03 and is void.

PHL relies on Protective Life Insurance Co. v. Sullivan, 892 F. Supp. 299 (D. Mass. 1995), to support its argument that the Policy's fraud exception is valid. There, the

---

[8] Bolstering this conclusion is Minnesota Statutes Section 62A.04, which concerns health and disability insurance. The incontestability clause in that statute expressly provides that "[a]fter two years from the date of issue . . . no misstatements, *except fraudulent misstatements*, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim." Minn. Stat. § 62A.04, subd. 2(2). Certainly, the Minnesota legislature would have included a similar exception in Section 61A.03 had it intended for one to exist.

court held that an incontestability clause in a life insurance policy was not void under Massachusetts law, despite containing a fraud exception similar to the one at issue here. Id. at 301-02. But PHL's reliance on Sullivan is misplaced, for two reasons. First, the Massachusetts incontestability statute at issue in Sullivan conflicted with another Massachusetts law permitting insurers to defend claims based upon fraud. The Sullivan court, attempting to reconcile the two statutes, concluded that a fraud exception to incontestability necessarily existed based on this other statute. No Minnesota law undermining Section 61A.03 has been identified here.

Second, and of far more importance, Sullivan did not withstand scrutiny on appeal. After the insurer prevailed in the district court, the insured appealed to the First Circuit. The appellate court, recognizing the conflict in the Massachusetts statutes, certified to the Massachusetts Supreme Judicial Court the question whether an insurer was barred under Massachusetts law from including a fraud exception in a life insurance policy's incontestability clause. See 89 F.3d 1, 4-5 (1st Cir. 1996). The Supreme Judicial Court answered that question in the affirmative. See 682 N.E.2d 624, 630-34 (Mass. 1997). The First Circuit then reversed and directed the district court to enter judgment in favor of the insurer. See Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P., 171 F.3d 52, 53-54 (1st Cir. 1999).[9] Sullivan, therefore, cannot aid PHL's cause here.

---

[9] Neither party has referenced this procedural history in Sullivan.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, USB's Motion to Dismiss Count II of the Complaint (Doc. No. 15) is **GRANTED** and Count II is **DISMISSED WITH PREJUDICE**.

Date: October 4, 2010

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge
